IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE BROOKLYN UNION GAS COMPANY,

        Plaintiff,

    -against-

EXXON MOBIL CORPORATION,
UNITED STATES OF AMERICA,
PARAGON OIL INC./TEXACO, INC.,
BAYSIDE FUEL OIL DEPOT CO.,
IRON MOUNTAIN, INC.,
CITY OF NEW YORK,
MOTIVA ENTERPRISES LLC,
BUCKEYE PARTNERS, L.P.,
SUNOCO, INC. (R&M),
CHEVRON U.S.A. INC.,
19 KENT ACQUISITION LLC,
NORTH 12TH ASSOCIATES LLC,
35 KENT AVE LLC,
NEW 10TH STREET LLC, and
PATTI 3 LLC.

        Defendants.

**SECOND AMENDED COMPLAINT**

Civil Action No.: 1:17-cv-00045-MKB-ST

        Plaintiff The Brooklyn Union Gas Co. d/b/a National Grid NY ("National Grid"), for its Amended Complaint against Defendants Exxon Mobil Corporation; the United States of America; Paragon Oil Inc./Texaco, Inc.; Bayside Fuel Oil Depot Co.; Iron Mountain, Inc.; City of New York; Motiva Enterprises LLC; Buckeye Partners, L.P.; Sunoco, Inc. (R&M); Chevron U.S.A. Inc.; 19 Kent Acquisition LLC; North 12th Associates LLC; 35 Kent Ave LLC; New 10th Street LLC; and Patti 3 LLC alleges as follows:

## I. **INTRODUCTION**

1.      This is a civil action for cost recovery arising out of the disposal, release, and/or threatened release of hazardous substances into the environment at current and historical facilities owned and/or operated by Defendants Exxon Mobil Corporation ("ExxonMobil" or "Exxon"), the United States of America ("United States"), Paragon Oil Inc./Texaco, Inc. ("Paragon"), Bayside Fuel Oil Depot Co. ("Bayside"), Iron Mountain, Inc. ("Iron Mountain"), City of New York ("New York" or the "City"), Motiva Enterprises LLC ("Motiva"), Buckeye Partners, L.P. ("Buckeye"), Sunoco, Inc. (R&M) ("Sunoco"), Chevron U.S.A. Inc. ("Chevron"), 19 Kent Acquisition LLC ("19 Kent"), North 12th Associates LLC ("North 12th"), 35 Kent Ave LLC ("35 Kent"), New 10th Street LLC ("New 10th"), and Patti 3 LLC ("Patti 3") adjacent to the Bushwick Inlet and the East River in Brooklyn, New York (the "Bushwick Site" or the "Site").

2.      Plaintiff, The Brooklyn Union Gas Company d/b/a National Grid NY, is a New York corporation located at One MetroTech Center, Brooklyn, New York 11201.  Plaintiff's historical Williamsburg Works Manufactured Gas Plant ("Williamsburg MGP") was operated and controlled by Defendant ExxonMobil and/or its corporate predecessors and sat on the Bushwick Site, adjacent to the facilities owned and/or operated by Defendants.

3.      Defendant ExxonMobil is a New Jersey corporation with a principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039-2298.  Exxon's corporate predecessors Charles Pratt & Co., Astral Oil Company, and Standard Oil owned, managed, and/or operated the Pratt Works Refinery on the Bushwick Site.  The site of the Pratt Works Refinery (the "Refinery" or the "Refinery Site") was owned by ExxonMobil and/or its corporate predecessors.  The Refinery manufactured kerosene from coal and/or crude petroleum and produced naphtha and lubricant oils.  Constructed in the 1860s, the facility utilized numerous

gravitational and/or physical or chemical oil/water/solid separation units, such as ditches and other conveyances, sumps, stormwater units, tanks, induced air flotation units, and impoundments. These separation units generated sludges that were discharged and released to the environment. The facility used over forty tanks holding tar, crude oil, and refined materials that generated tank bottoms, which were discharged and released to the environment. In addition, the materials contained within these tanks came into contact with or became entrained with the tank bottoms before they were discharged and released into the environment. Various solvents, acids, and catalysts were used and discharged to the environment.

4. Many structures contained asbestos, which also was released into the environment. The Refinery was among the world's largest refinery operations through the 1880s. Operations at the Pratt Works Refinery continued through the 1920s. During its decades of operation at the Bushwick Site, ExxonMobil and/or its corporate predecessors caused the disposal and release into the environment of hazardous substances such as sludge generated from separation units, emulsion solids, cleaning sludges, tank bottoms, storage tank sediments, spent catalyst, waste oil, and various materials that came into contact with these hazardous substances or became entrained with these hazardous substances, such as gasoline, and/or petroleum. The constituents from these substances including metals, volatile organic compounds ("VOCs"), and semi-volatile organic compounds ("SVOCs") also came to be located on and near the Site. In addition, these hazardous substances came into contact with or became entrained with gasoline and other petroleum products that were released at the Site.

5. Defendant United States is a sovereign country which, acting through its departments, agencies, and instrumentalities, operated and/or owned facilities that contributed to the release of hazardous substances at the Bushwick Site. The United States' Ordnance

Department of the War Department owned and operated a historic toluol recovery plant on the Bushwick Site, producing toluol, benzene, ethylbenzene, and xylene from petroleum and coal. Constructed in the early 1900s, the plant also produced and released to the environment waste products including benzol and naphtha. During its operations at the Bushwick Site, the United States caused the disposal and release of hazardous substances such as toluol, benzol, naphtha, waste oil, sludges, acids, solvents, and asbestos, and constituents from these substances including metals, volatile organic compounds, and semi volatile organic compounds came to be located at, on, and near the Site. In addition, these hazardous substances came into contact with, or became entrained with, gasoline and other petroleum products that were released at the Site.

6.      The United States Navy, a department of Defendant United States, operated at the site of Plaintiff National Grid's Williamsburg MGP in the mid-1940s. During its operations at the Bushwick Site, the United States caused the disposal and release of hazardous substances such as metals, VOCs, and cyanide on or near the Site.

7.      Defendant Paragon Oil Inc./Texaco, Inc. is a Delaware corporation with a registered agent at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Paragon owned and operated petroleum loading and holding facilities on the Pratt Works Site. During its operations at the Bushwick Site, Paragon Oil Inc./Texaco, Inc. caused the disposal and release of hazardous substances, such as sludge generated from separation units, cleaning sludges, tank bottoms, storage tank sediments, waste oil, and various materials that came into contact with these hazardous substances or became entrained with these hazardous substances, such as gasoline and/or petroleum. Constituents from these hazardous substances including metals, VOCs, and SVOCs came to be located at, on, or near the Site.

8.    Defendant Bayside Fuel Oil Depot Corporation is a New York corporation with a principal place of business at 1776 Shore Parkway, Brooklyn, New York 11214.  Bayside owned and operated home oil holding tanks at the Bushwick Site for decades.  Bayside had the capacity to store more than 400,000 gallons of oil.  During its operations at the Bushwick Site, Bayside Fuel Oil Depot Corporation caused the disposal and release of hazardous substances such as methyl-tert-butyl ether ("MTBE"), VOCs, SVOCs, polycyclic aromatic hydrocarbons ("PAHs"), lead, coal tar pitch volatiles, and various materials that came into contact with these hazardous substances or became entrained with these hazardous substances, such as gasoline and/or petroleum.  Constituents from these hazardous substances including metals, VOCs, and SVOCs came to be located at, on or near the Site.

9.    Defendant Iron Mountain Incorporated is a Delaware corporation with a registered agent at 2711 Centerville Hall Road Suite 400, Wilmington, Delaware 19808.  Iron Mountain's corporate predecessors Recall and CitiStorage used several buildings and facilities at the Bushwick Site.  Until a 2015 fire destroyed much of the operations and scattered debris across Williamsburg, CitiStorage housed a 1.1 million cubic foot document storage facility.  Remnants of the facility still sit on the Bushwick Site today.  During its operations at the Bushwick Site, Iron Mountain Incorporated caused the disposal and release of hazardous substances on or near the Site, including those resulting from the fire at the facility.  Iron Mountain's land at the Williamsburg Site is contaminated with hazardous substances such as PAHs, naphtha, benzene, tar, petroleum, waste oil, and ash from the fire.

10.    Defendant City of New York is a political subdivision of New York State which, acting through its departments, agencies, and instrumentalities, operated and/or owned facilities that contributed to the disposal of hazardous substances at the Bushwick Site.  The City's

Department of Sanitation owned and operated a bulk petroleum storage facility ("Sanitation Garage") at the Bushwick Site. The City had twelve bulk storage tanks onsite. During its operations at the Bushwick Site, New York caused the disposal and release of hazardous substances, such as sludge generated from separation units, cleaning sludges, tank bottoms, storage tank sediments, waste oil, and various materials that came into contact with these hazardous substances or became entrained with these hazardous substances, such as gasoline and/or petroleum. Constituents from these hazardous substances including metals, VOCs, and SVOCs came to be located at, on, or near the Site.

11.     Defendant Motiva Enterprises LLC is a Delaware corporation with a registered agent at CT Corporation System, 111 Eighth Avenue, New York, NY 10011. Motiva owned portions of the Bushwick Site and was involved in industrial activities at the facilities of Defendant Paragon. During its operations at the Bushwick Site, Motiva caused the disposal and release of hazardous substances, such as sludge generated from separation units, cleaning sludges, tank bottoms, storage tank sediments, waste oil, and various materials that came into contact with these hazardous substances or became entrained with these hazardous substances, such as gasoline and/or petroleum. Constituents from these hazardous substances including metals, VOCs, and SVOCs came to be located at, on or near the Site.

12.     Defendant Buckeye Partners L.P. is a Texas entity with an address at One Greenway Plaza, Suite 600, Houston, Texas 77046. Buckeye's predecessor Buckeye Pipeline Company owned and operated a petroleum pipeline delivery network at the Bushwick Site. During its operations at the Bushwick Site, Buckeye Partners L.P. caused the release of hazardous substances, such as sludge generated from separation units, cleaning sludges, tank bottoms, storage tank sediments, waste oil and various materials that came into contact with

these hazardous substances or became comingled with these hazardous substances, such as gasoline and/or petroleum.  Constituents from these hazardous substances including metals, VOCs, and SVOCs came to be located at, on, or near the Site.

13.    Defendant Sunoco, Inc. (R&M) is a Pennsylvania corporation with an address at 1735 Market Street, Philadelphia, PA 19103-7501.  Sunoco and/or its predecessor Sun Company Inc. (R&M) maintained operations—including, on information and belief, petroleum bulk storage—at the Pratt Works Refinery in the 1990s and possibly beyond.  During its operations at the Bushwick Site, Sunoco caused the disposal and release of hazardous substances, such as sludge generated from separation units, cleaning sludges, tank bottoms, storage tank sediments, waste oil, and various materials that came into contact with these hazardous substances or became entrained with these hazardous substances, such as gasoline and/or petroleum. Constituents from these hazardous substances including metals, VOCs, and SVOCs came to be located at, on, or near the Site.

14.    Defendant Chevron U.S.A. Inc. is a wholly-owned subsidiary of Chevron Corporation with its headquarters at 6001 Bollinger Canyon Road Rd V2322A, San Ramon, CA 94583.  Chevron owned and operated scrap oil truck repair and storage operations at the Bushwick Site from 1958 to 1982.  During its operations at the Bushwick Site, Chevron caused the disposal and release of hazardous substances, such as waste oil, solvents, coolants, and various fluids and materials from the vehicles stored and repaired at the Site.  Constituents from these hazardous substances including metals, VOCs, and SVOCs came to be located at, on, or near the Site.

15.    Defendant 19 Kent Acquisition LLC is a New York corporation with an address at CT Corporation System, 111 Eighth Avenue, New York, New York 10011.  19 Kent owns a

parcel of land on the Site that is contaminated with hazardous substances such as gasoline, naphtha, benzene, tar, petroleum, waste oil, sludge generated from separation units, cleaning sludges, tank bottoms, oil storage tank sediments, and constituents from these substances including metals, VOCs, and SVOCs.

16.     Defendant North 12th Associates LLC is a New York corporation with an address at 35 Kent Avenue, Brooklyn, New York 11211.  North 12th owns a parcel of land on the Site that is contaminated with hazardous substances such as gasoline, naphtha, benzene, tar, petroleum, waste oil, sludge generated from separation units, cleaning sludges, tank bottoms, oil storage tank sediments, and constituents from these substances including metals, VOCs, and SVOCs.

17.     Defendant 35 Kent Ave LLC is a New York corporation with an address at G4 Development Group LLC, 14 Skillman Street, Roslyn, New York 11576.  35 Kent owns a parcel of land on the Site that is contaminated with hazardous substances, such as toluol, benzol, naphtha, waste oil, sludge generated from separation units, cleaning sludges, tank bottoms, oil storage tank sediments, and constituents from these substances including metals, VOCs, and SVOCs.

18.     Defendant New 10th Street LLC is a Delaware corporation with an address at 5 North 11th Street, Brooklyn, New York 11249.  New 10th owns a parcel of land on the Site that is contaminated with hazardous substances such as gasoline, naphtha, benzene, tar, petroleum, waste oil, sludge generated from separation units, cleaning sludges, tank bottoms, oil storage tank sediments and constituents from these substances including metals, VOCs, and SVOCs.  On information and belief, New 10th recently reached an agreement to sell its parcel to the City of New York.  Noah Remnick, *New York Buys Last Tract for Williamsburg Waterfront Park for*

*$160 Million*, N.Y. TIMES, Nov. 24, 2016, http://www.nytimes.com/2016/11/24/nyregion/new-york-buys-last-tract-for-williamsburg-waterfront-park-for-160-million.html?_r=0.

19.     Defendant Patti 3 LLC is a New York corporation with an address at 8 Berry St, Brooklyn, New York 11249.  Patti 3 owns a parcel of land on the Site that is contaminated with hazardous substances such as gasoline, naphtha, benzene, tar, petroleum, waste oil, sludge generated from separation units, cleaning sludges, tank bottoms, oil storage tank sediments, and constituents from these substances including metals, VOCs, and SVOCs.

20.     This action is brought under the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the New York Navigation Law, N.Y. Nav. Law §§ 170 – 197.

21.     National Grid has incurred, and may in the future incur, substantial response costs relating to environmental investigation, remediation, and monitoring of the Bushwick Site. National Grid seeks a judgment against Defendants awarding response costs for Defendants' share of such costs under 42 U.S.C. § 9607(a), 42 U.S.C. § 9613(f)(3), and N.Y. Nav. Law §§ 170 – 197.

## II.  JURISDICTION AND VENUE

22.     This court has jurisdiction over this action's federal claims pursuant to 42 U.S.C. § 9607 and 28 U.S.C. §§ 1331 & 1332.  This Court has jurisdiction over related State law claims pursuant to 28 U.S.C. § 1367.

23.     The court has the authority to issue a declaratory judgment concerning the rights and liabilities of the parties pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201.

24.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the historical facilities owned and/or operated by Defendants were located within the district.

### III.  BACKGROUND AND ALLEGATIONS

A.    Kerosene Refineries

25.    In the mid-1800s, American energy companies began to construct refineries to extract kerosene from coal and petroleum.  Kerosene was extracted from coal by heating it in a vessel known as a retort, which permitted vapor to condense and separate from the coal. Kerosene was extracted from crude petroleum through a complex heating and cooling distillation process.

26.    Less volatile and flammable than gasoline, kerosene was widely used for heating, lighting, and cooking beginning in the nineteenth century.  Kerosene is still in use today for cooking, as a lubricant, as an ingredient in pesticides, and as a jet fuel.

27.    Based on information and belief, then non-marketable waste materials, including gasoline, were disposed of in various ways, including dumping onto land or water bodies where such materials became entrained with other hazardous substances.

28.    On information and belief, hazardous substances present at the Bushwick Site are consistent with those associated with kerosene refineries.

B.    Manufactured Gas Plants

29.    Between 1816 and the early 1970s, approximately 1,000 to 1,500 manufactured gas plants ("MGPs") were built and operated in the United States.  After approximately 1872, petroleum products were used to produce gas at MGPs.  Prior to the development of natural gas

transmission systems in the 1940s and 1950s, much of the gas used in the United States for heating, cooking, and lighting was manufactured at MGPs.

30.     Holder stations situated near MGPs acted as gas storage and distribution locations.

31.     All manufactured gas processes generated tar and oil as residues.

32.     The Brooklyn Union Gas Company has begun investigation and characterization activities at the Site focused in part on the former MGP operations.  These activities have developed evidence of significant non-MGP contamination, which is believed to result from Defendants' various operations, including Defendant Exxon's control of The Brooklyn Union Gas Company.

C.     Toluol Recovery Operations

33.     Trinitrotoluene ("TNT") was a principal explosive used by the United States during World War I.  During the war, the United States relied on toluol to manufacture TNT.  To compensate for a dramatic shortage in toluol, the Ordnance Department of the War Department urged the construction of By-Products Process Plants (also referred to as light oil recovery plants) – a form of chemical plant – across the country.

34.     Typically, the Ordnance Department would select a company to construct the By-Products Process Plants at or adjacent to an existing energy plant.  The Ordnance Department's contractor would then instruct the energy plant's owner on operation of the By-Products Process Plant, at which time the By-Products Process Plant would be turned over to the energy plant's owner, who would operate the government-owned equipment for the Ordnance Department.

35.     The Ordnance Department provided materials and funding needed to operate the By-Products Process Plants, including wash oil, materials and labor costs, and overhead and administrative expenses.

36.     The extraction of toluol involved taking fresh oil or debenzolized oil from storage tanks and pumping it through scrubbers, through vapor, through oil separators, into a condenser, through a series of heaters, and through a series of dephlegmators and condensers. The extraction process resulted in toluol, benzol, naphtha, off-spec materials, and waste oil.  Storage of oil and these materials would result in other forms of waste, including sludges, waste tank bottoms and sediments, and used oil.

37.     Once the toluol, benzol, naphtha, and waste oil were collected, stored in drums, and shipped to the War Department.

38.     Based on information and belief, toluol plants would generate hazardous substances, including toluol, benzol, naphtha, off-spec materials, and waste oil that were disposed of in various ways, including dumping onto land or water bodies where such hazardous substances could become entrained with other materials, including gasoline and/or petroleum.

39.     Based on information and belief, hazardous substances present at the Bushwick Site are consistent with those released by toluol plants.

D.     Petroleum Bulk Storage Terminals

40.      Petroleum bulk storage terminals are facilities that handle and store petroleum products in on-site tanks, drums, or other containers.  These storage units can be both aboveground and underground.  These facilities also load and unload products from boats, trains, or trucks and engage in a number of maintenance activities onsite.

41.    Terminals can house any number of petroleum products, including gasoline, kerosene, and diesel petroleum fuel.  Waste oil, cleaning solvents, maintenance machinery, hydraulic fluids, lubricants, fuel, electrical equipment, paints, detergents, cleaners, and varnishes used to maintain the equipment, buildings, and vehicles onsite are also commonly stored at petroleum bulk storage terminals.

42.    Given the nature of the material stored at these terminals, the facilities generate industrial hazardous waste.  It is not uncommon for contaminant releases to occur during loading, unloading, cleaning, hydrostatic water tests, tank cleanings, oil/water/solid separator cleanings, and during precipitation events.  Hazardous substances disposed of and released from petroleum bulk storage terminals include oil, grease, heavy metals, PAHs, VOCs, SVOCs, polychlorinated biphenyls ("PCBs"), waste oil, separator sludge, and tank bottom wastes.  On information and belief, petroleum and petroleum products released by bulk storage terminals can become entrained with and facilitate the migration of various hazardous substances.

43.    Petroleum bulk storage terminals either store products for transport by others or transport their stored products to the products' ultimate users or to other storage facilities. Petroleum can be transported from the facilities via trucks, barges, or pipelines running through the facility.

44.    On information and belief, petroleum bulk storage terminals release hazardous substances into the environment in a variety of ways, including spills during on-loading and off-loading, spills during equipment maintenance, tank cleanings, leaks hydrostatic water tests, tank clearings, oil/water/solid separator cleanings, and during precipitation events.

45.    On information and belief, hazardous substances located at the Bushwick Site are consistent with those associated with petroleum bulk storage terminals.

E.      Location

46.     The Bushwick Site is located in Brooklyn, New York, adjacent to the Bushwick Inlet and the East River.  Exhibits A-F.

47.     The Pratt Works Refinery and the Williamsburg MGP were located between N. 10th Street on the south, N. 14th Street on the North, the East River on the west, and just east of Kent Avenue on the east.  Exhibit A.

48.     The Pratt Works Refinery bound the Williamsburg MGP on two sides.  The MGP's operations were confined to a sliver of land between multiple Pratt Works parcels to the north and south.  Exhibit A.

49.     The MGP Site sits on two blocks comprising four parcels that are adjacent to and bound by the Pratt Works Refinery.  The MGP Site comprises portions of Exhibit A.

50.     The Wythe Avenue Holder Station was located on Block 2283 at 94, 120, and 132 N. 13th Street; 20, 24, 28, and 32 Berry Street; and 121, 125, and 129 N. 12th Street.  Exhibit A.

51.     The Pratt Works Refinery comprises Block 2294 (between N. 10th Street and N. 11th Street, west of Kent Avenue and separated from Block 2287 by N. 11th Street), also known as Parcel 5; Block 2277 (north of N. 12th Street, west of Kent Avenue and separated from Block 2287 by N. 12th Street), known as N. 12th Street Refinery or N. 13th Street Plant, and also known as Parcel 6; portions of Block 2282 (east of Kent Avenue, between N. 12th Street and N. 13th Street separated from Block 2277 by Kent Avenue and separated from Block 2288 by N. 12th Street), also known as Parcel 7; and the site of the former Eagle Oil Works on portions of Block 2279 (west of Berry Street, between N. 13th Street and N. 14th Street), also known as Parcel 8.  Exhibit A.

52.     The U.S. Government's toluol plant was located adjacent to and coterminous with the Williamsburg MGP.  The toluol plant occupied Block 2287 Lots 1 and 16 and Block 2288

Lot 1.  By 1946, this plant had been dismantled and razed.  Before then, the parcel it was built upon had been deeded to The Brooklyn Union Gas Company and was incorporated into its operations.  Exhibit B.

53.    The U.S. Navy had operations on Blocks 2287 and 2288.  Exhibit B.

54.    Paragon Oil's operations were located at the Refinery Site on Blocks 2277 and 2287.  Exhibit C.

55.    The Bayside Fuel parcel is at the Refinery Site at 1 N. 12th Street on Block 2277, west of Kent Avenue between N. 12th Street and N. 13th Street.  Exhibits C and D.

56.    The Iron Mountain Incorporated CitiStorage parcel occupies portions of Block 2287 and parts of Block 2294 at 5 N. 11th Street.  Exhibit D.

57.    The City of New York's Sanitation Garage was located at 50 Kent Avenue on Block 2287.  Exhibits C, D, and E.

58.    The City of New York currently owns Block 2277.  Exhibit E.  On information and belief, the City of New York is in the process of purchasing Block 2287 and Block 2294 from Defendant New 10th and is an indemnitor for Defendants Motiva, 19 Kent, North 12th, 35 Kent, and New 10th.

59.    Motiva Enterprises LLC's operations were located at the Refinery Site on Block 2277.  Exhibit D.

60.    Sunoco's operations were located on Block 2277.  Exhibit D.

61.    Chevron owned and/or operated portions of Block 2287 Parcels 3 and 4 at the Bushwick Site.  This includes portions of the Williamsburg MGP and portions of property occupied by Bayside Fuel.  Exhibit C.

62.     19 Kent owns a portion of Block 2282.  Exhibit E.  Defendant Exxon formerly operated on Block 2282.  Exhibits A and B.

63.     North 12th owns a portion of Block 2288.  Exhibit E.  Defendant United States formerly operated on Block 2288.  Exhibit B.

64.     35 Kent owns a portion of Block 2288.  Exhibit E.  Defendant United States formerly operated on Block 2288.  Exhibit B.

65.     New 10th owns a portion of Block 2294 and Block 2287.  Exhibit E.  Defendants United States of America, Chevron, City of New York, and Iron Mountain formerly operated on Block 2287.  Exhibits A, B, C, and D.  Defendants Exxon and Iron Mountain formerly operated on Block 2294.  Exhibits A, B, and D. On information and belief, New 10th reached an agreement to sell its property on Blocks 2294 and 2287 to the City of New York in November 2016.  Noah Remnick, *New York Buys Last Tract for Williamsburg Waterfront Park for $160 Million*, N.Y. TIMES, Nov. 24, 2016, http://www.nytimes.com/2016/11/24/nyregion/new-york-buys-last-tract-for-williamsburg-waterfront-park-for-160-million.html?_r=0.

66.     Patti 3 owns a portion of Block 2279.  Exhibit E.  Defendant Exxon formerly operated on Block 2279.  Exhibit A.

67.     Multiple defendants, including Buckeye and Standard Oil, owned and operated an extensive pipeline network on and surrounding the Bushwick Site.  See Exhibit F.

F.    ExxonMobil's History of Refinery Operations

68.     Construction of the Pratt Works Refinery began in the 1860s and was complete in 1870 under the name Charles Pratt & Company.  The Refinery was an instant success; both Charles Pratt and his Astral Oil—the name he gave the kerosene the Refinery produced—found great popularity.  Circa 1873, Pratt became a director of Standard Oil Company as his company was brought into Standard Oil.  The following year, Pratt's company was reorganized to act as a

holding company for Standard Oil Company.  In 1892, following years of close corporate ties between the companies, Standard Oil Company purchased the property of Charles Pratt & Company, including the Refinery.  On information and belief, by this time, Standard Oil had also acquired Eagle Oil Company, which had established its Eagle Oil Works refinery near to the Pratt Works Refinery by 1868.  These acquisitions were part of a much larger Standard Oil program; as noted in the draft Newtown Creek Data Applicability Report, the company would eventually own and operate fifty refineries in the area near Newtown Creek in Brooklyn.

69.     From 1870 through the early 1900s, Pratt Works Refinery primarily manufactured, refined, and exported kerosene for illumination.  Crude oil would arrive via ships, railroad, or pipelines.  Once the crude oil was onsite, the manufacturing process involved four primary steps: (1) fractional distillation, in which petroleum was transferred into horizontal cylindrical stills and heated to force it to separate into its constituent components which were then run through cool running water and separated into a series of smaller tanks; (2) condensation of the kerosene distillate; (3) agitation of the distillate with acid in order to bleach and deodorize; and (4) agitation with caustic soda or ammonia in order to neutralize any acids remaining in the kerosene.

70.     Pratt's sales grew rapidly, and the Refinery expanded accordingly.  The Refinery only began operations around 1870, but by 1872 more than 250,000 families relied on Pratt's Astral Oil for their heating and cooking needs.  In 1872, Pratt Works was refining about seven million gallons of crude petroleum a year.  By 1876, the Refinery handled nearly forty-three million gallons of crude petroleum a year.  This translates to over 120,000 gallons of crude oil refined each day at Pratt Works.

71.     At its peak, the operation was one of the largest of its kind in the country, employing over seven hundred individuals and handling more than sixty million gallons per year of kerosene, crude petroleum, refined oils, naphtha, tar, benzene, lubricating oils, gasoline, and turpentine.  Pratt Works had in excess of forty tar and naphtha tanks onsite, numerous oil/water/solid separation units, and asbestos containing material covered numerous pieces of equipment.  The tanks, separation units, and other equipment released materials into the environment at the Site.

72.     As Pratt Works' kerosene production operations grew, the Refinery began a factory for constructing tin cans for use in canning and distributing kerosene.  By the late 1880s, the canning factory grew to occupy two floors of one of the buildings onsite.  The cannery's principal output was five-gallon cans for exporting refined oil.  In addition to the five-gallon cans, the cannery manufactured specialized transport containers, such as ten-gallon galvanized drums.  The cannery's success was such that at some point the cannery may have been the main operation at the Pratt Works as refining operations possibly halted altogether.  The Refinery housed numerous oil storage and filling tanks to manage shipments of kerosene.

73.     Based on information and belief, the canning and shipping operations would result in the release of hazardous substances including metals, VOCs , and SVOCs, all of which remain at or adjacent to the Bushwick Site.

74.     To supply Standard Oil's ever-growing corporate holdings in Brooklyn, a Standard Oil Company pipeline snaked around the borough.  A Standard Oil affiliate built a 6" pipeline to serve Brooklyn-area refineries in 1879.  The pipeline extended beneath the Hudson River, through modern-day Central Park, and under the East River to Newtown Creek.

75.     In the early 1880s and into the early 1900s, Standard Oil extended the pipeline to the Refinery and the Williamsburg MGP.  That pipeline crossed Newtown Creek to Sone and Fleming Oil Works.  From there, the pipeline extended down along Meserole Avenue south to Franklin Street near N. 15th Street, south on Franklin Street to N. 14th Street near Block 2282 (Parcel 7), south along Kent Avenue, west through Block 2277 (Parcel 6), south across N. 12th Street through Block 2287 (Parcel 3), south across N. 11th Street to Block 2294 (Parcel 5), north across N. 11th Street through Block 2287 (Parcel 4), and north across N. 12th Street to Block 2277 (Parcel 6).  Exhibit F.  The Standard Oil pipeline ran through the Williamsburg MGP, connecting portions of the Refinery on Block 2277 and Block 2294.  Exhibit F.

76.     In the early 1930s, Standard Oil installed 6" steam piping running across the Williamsburg MGP.  This piping, installed 16-19' above N. 11th Street and N. 12th Street, conveyed steam between Standard Oil's operations at Block 2294 and Block 2277.

77.     On information and belief, another Standard Oil pipeline ran through the East River and into the northwest corner of Brooklyn.  This pipeline ran through the Brooklyn Navy Yard north to the Refinery Site.  Pipelines were the main method of transporting crude oil to the Refinery from the 1880s until approximately 1920, when barges became the primary method of transport.  An asphalt dock on the East River accommodated barges, while an onsite railroad depot was also used to transport crude oil and export kerosene and other products.

78.     The Pratt Works Refinery was plagued with accidents, spills, and leaks.  In many instances, these problems arose before the crude oil even arrived at the Refinery.  Until 1907, the Refinery regularly combatted fires on the wooden sailing ships that were used to deliver crude oil in wooden barrels.

79.    Multiple fires ravaged the Refinery.  An 1871 fire was contained to a single oil tank, but another fire in the winter of 1873 consumed six stills full of crude oil and poured burning oil along the snow, creating spiral columns of fire which threatened to destroy the Williamsburg MGP.  The 1884 fire burned through eight tanks of crude oil, four tanks of naphtha, and one tank of tar.  That fire extended to the wharf where oil-filled schooners docked. Boiling oil overflowed from the sinking ships straight into the water, and a floating island of oil, 50-yards in diameter, was only contained by fire-boats.  In 1891 and 1895, explosions rocked the stills and distilling tanks at the Refinery.  In 1909, Bushwick Inlet burned with burning oil after drainage from the Refinery was carried up stream and caught fire when a boat passenger threw a cigar into the water.

80.    The many accidents, spills, leaks, and fires at the Pratt Works Refinery resulted in the discharge and release of multiple contaminants, including kerosene, crude petroleum, refined oils, naphtha, tar, benzene, lubricating oils, turpentine, sludges, tank bottoms and sediments, solvents, acids, catalysts, and asbestos.

81.    The facility utilized numerous gravitational and/or physical or chemical oil/water/solid separation units, such as ditches and other conveyances, sumps, stormwater units, tanks, induced air flotation units, and impoundments.  These separation units generated sludges that were discharged and released into the environment.

82.    The facility used over forty tanks holding tar, oil, and materials that generated tank bottoms and sediments, which were discharged and released to the environment.   In addition, the materials contained within these tanks came into contact with or became entrained with the tank bottoms before they were discharged and released into the environment.

83.    Various solvents, acids, and catalysts were used and discharged into the environment.

84.    Many structures contained asbestos, which also was released into the environment.

85.    Upon information and belief, the hazardous substances, including the non-marketable petroleum based materials became entrained with other materials at and adjacent to the Bushwick Site.

86.    Upon information and belief, these non-marketable petroleum wastes associated with the Pratt Works Refinery and other hazardous substances including slop oil, separator sludge, and tank bottom residue remain upon, and in the vicinity of, the Bushwick Site.

G.    The United States' History of Operations at the Bushwick Site

87.    The Ordnance Department of the U.S. Government's War Department erected several By-Products Process Plants around the country in the early 1900s.  These plants were all designed to recover toluol to assist with the war effort during World War I.  Brooklyn was home to several of these plants.

88.    On October 8, 1918, operations started at the United States' toluol recovery plant adjacent to The Brooklyn Union Gas Company's Williamsburg Works plant.  The plant generated an estimated 407,000 gallons of toluol.

89.    The United States Navy maintained operations and leased property at the Williamsburg MGP in the mid-1940s.

90.    Based on information and belief, the toluol plant generated hazardous substances, including toluol, benzol, naphtha, off-spec materials, sludge, solvents, and waste oil that were disposed of in various ways, including dumping onto land or water bodies where such hazardous substances became entrained with other materials, including gasoline and/or petroleum.

H.    Paragon Oil Company/Texaco Inc.'s History of Operations

91.    Before 1965, Paragon Oil Company, Division of Texaco Inc. owned and operated the site of the Pratt Works Refinery.  By 1965, Paragon operated the site with ten new holding tanks: four 500,000-gallon gasoline tanks, one 212,000-gallon kerosene tank, one 1,050,000-gallon No 2 fuel oil tank, one 840,000-gallon No. 4 fuel oil tank, two 212,000-gallon diesel oil tanks, and one 1,206,000-gallon No. 6 fuel oil tank.  There was also a truck loading area on the eastern portion of the Site at this time.

92.    Based on information an belief, Paragon Oil Company's operations at the Bushwick Site would have released various hazardous substances incidental to storage of oil and other industrial activities, including tank bottoms and sediments, off-spec materials, separator sludge, solvents, metals, VOCs, and SVOCs, all of which remain at or adjacent to the Bushwick Site.

I.    Bayside's History of Operations

93.    Bayside Fuel Oil Depot Corporation was founded in 1965 and began petroleum storage and distribution operations in the New York area shortly thereafter.  Sometime after 1982, Bayside Fuel Oil Depot Corporation converted portions of Block 2277 to house oil holding tanks.

94.    The New York State Department of Environmental Conservation ("NYSDEC") considers Bayside's site in Brooklyn to be a Major Oil Storage Facility ("MOSF").

95.    Operations included twelve above-ground storage tanks containing gasoline, kerosene, No. 2 fuel oil, and Lubrizol.  These tanks had volumes ranging from 8,000 to 1,260,000 gallons.

96.     The site housing Bayside's operations contained a warehouse built in 1914 with a 275-gallon above-ground storage tank and an office onsite.  A hazardous waste storage area was located adjacent to the warehouse.

97.     Bayside's operations also included a steel masonry maintenance garage built in 1967.  Serving as a truck maintenance garage, the building had an interior drainage system that discharged into a collection sump onsite.

98.     Site investigations of the Bayside site, conducted during Bayside's period of ownership, have revealed MGP related contamination, which is entrained with other sources of contamination, including contamination from petroleum based materials.  Upon information and belief, these petroleum based materials came into contact with other hazardous substances, including sludges and tank bottoms and sediments, resulting in their migration and movement.

99.     Upon information and belief, this petroleum based material, including the hazardous substances currently entrained in it, remains upon, and in the vicinity of, the Bushwick Site.

100.    For example, a December 2002 Environmental Site Investigation directed by the New York Department of Environmental Conservation concluded that there was significant contamination onsite stemming from Bayside's petroleum product storage and handling.  Testing revealed that the majority of the site had been contaminated with petroleum hydrocarbons, benzene, toluene, ethylbenzene and xylene, MTBE, and lead.

101.    Bayside has had several spills, including one on February 23, 1996 at a facility owned by Defendant Chevron.  The New York State Department of Environmental Conservation issued a closure determination on January 23, 2008.  NYSDEC lists this as Spill No. 9804544. The amount spilled is unknown, but the spill contained MTBE, VOCs, polycyclic aromatic

hydrocarbons PAHs, lead, coal tar pitch volatiles, and gasoline.  On information and belief, petroleum and petroleum products acted as a solvent at the Site, facilitating the migration of other contaminants.

102.    Another site investigation was performed at the Bayside site in 2006 following the City of New York's proposal for construction of the proposed Williamsburg Park.  The purpose of the site investigation was to identify the character and extent of contamination in soil and groundwater related to historic and current operations at the Bayside site.

103.    The SI included 43 soil samples and 23 groundwater samples.  Soil samples were impacted with various petroleum-related contaminants.  The SI found widespread contamination at the Bayside site.  PCBs were identified between 0 and 25 feet below ground surface, and entrained petroleum contamination was found between 19 and 52 feet below ground surface.  The SI also found VOCs, PCBs, benzene, cyanide, and metals onsite.

104.    The contamination found during the 2002 and 2006 site investigations was likely caused, at least in part, by Bayside's operations at the Bayside site.

105.    On information and belief, the City of New York purchased Bayside's site in early 2016 and has assumed Bayside's MOSF permit obligations.

J.    Iron Mountain Incorporated History of Operations

106.    As part of a waterfront development project in the mid-1800s, the area now containing Iron Mountain Incorporated's CitiStorage unit ("CitiStorage Site") was landfilled.  The CitiStorage Site was historically used for storage of various types.  The CitiStorage Site consists of several warehouse buildings that have been used for document storage, but the site has been used for oil storage and distribution.

107.    Portions of the CitiStorage storage facility burned down in 2015, but its remnants remain at the Bushwick Site.

108.    Significant quantities of hazardous substances released by the fire, which burned for longer than a week, remain at the Bushwick Site.

K.    New York City Department of Sanitation History of Operations

109.    The New York City Department of Sanitation District 1 Garage was a petroleum bulk storage facility, operated on Parcel 2, and had a New York State Department of Environmental Conservation Remediation Site Number of 224028.  The Sanitation Garage held three underground and nine above-ground tanks.  All twelve tanks are currently listed as "closed," with one 2,000-gallon gasoline underground tank listed as closed in place.  Some tanks have been removed.

110.    Hazardous substances released from petroleum bulk storage terminals include tank bottoms and sediments, residues, grease, heavy metals, separator sludge, PAHs, VOCs, PCBs, waste oil, and the petroleum products that became entrained with the hazardous substances.

111.    On information and belief, petroleum released at this bulk storage terminal would become entrained with other hazardous substances at or adjacent to the Site.

L.    Motiva Enterprises LLC History of Operations

112.    Beginning in 1988, Motiva Enterprises LLC owned portions of the Bushwick Site.

113.    Between 1988 and 2014, Motiva owned an easement on portions of the Pratt Refinery containing the holding tanks and transportation areas owned and operated by Paragon.

114.    Similar to Paragon's period of ownership of the Refinery, during Motiva's ownership the Refinery would have released various hazardous substances incidental to storage of oil and other industrial activities, including tank bottoms and sediments, off-spec materials,

separator sludge, solvents, metals, VOCs, and SVOCs, all of which remain at or adjacent to the Bushwick Site.

115.    On information and belief, Motiva sold its remaining land to the City of New York in 2014.

M.    Buckeye Partners L.P. History of Operations

116.    Founded as Standard Oil pipeline subsidiary The Buckeye Pipeline Company in 1886, Buckeye became an independent publicly owned company in 1911.  Buckeye has historically specialized in petroleum transportation and terminalling, as well as natural gas storage and refined product marketing.

117.    In the 1930s and 1940s, Buckeye established a network of pipeline to transport crude petroleum to refineries throughout the eastern half of the country, including New York. Between the 1950s and 1970s, Buckeye continued its expansion in the New York area, constructing pipelines through the streets of New York City to transport products from refineries to three airports and other commercial customers in the metropolitan area.

118.    Buckeye's operations at the Bushwick Site included a pipeline running from the Pratt Works Refinery, east on N. 14th Street, and north along Wythe Avenue and Norman Avenue.

119.    On information and belief, the pipeline was used to deliver oil to Bayside and remains onsite.

120.    Upon information and belief, leaks associated with the pipeline would release petroleum and/or other substances which could become entrained with, and facilitate the migration of, hazardous substances already present on the Site.

N.    Sunoco, Inc. (R&M)'s History of Operations

121.    Sunoco and/or its corporate predecessor Sun Company, Inc. (R&M) maintained operations at the Refinery beginning in 1992.  On information and belief, these operations likely consisted of petroleum bulk storage and transportation.

122.    On information and belief, hazardous substances released from petroleum bulk storage terminals include tank bottoms and sediments, residues, grease, heavy metals, separator sludge, PAHs, VOCs, PCBs, waste oil, and the petroleum products that became entrained with the hazardous substances.

123.    On information and belief, petroleum released at this bulk storage terminal would become entrained with other hazardous substances at or adjacent to the Site.

O.    Chevron U.S.A. Inc.'s History of Operations

124.    From 1958 until 1982, Chevron owned and operated Parcels 3 and 4 at the Bushwick Site.  Under Chevron's control, these Parcels, which had previously housed the historic Williamsburg MGP, were used for industrial activities including an oil truck repair shop and an oil truck parking facility.  These facilities have a New York State Department of Environmental Conservation Facility Number 211970.

125.    Based on information and belief, these operations would likely release hazardous substances similar to those found at the Site through leaks and spills incidental to their general operation.  Hazardous substances released at the Site would include hydraulic fluids, fluids from vehicles, oil, grease, heavy metals, PAHs, VOCs, PCBs, and waste oil.

126.    Additionally, these operations could release petroleum, which would become entrained with, and facilitate the migration of, other hazardous substances already present on the Bushwick Site.

P.     Standard Oil's Operation and Ownership of the Williamsburg MGP

127.    The Williamsburg MGP was constructed around 1850 by the Williamsburg Gas Light Company.  The MGP was constructed in a six acre parcel adjacent to and bound by the Refinery on two sides.

128.    In the late 1800s, John D. Rockefeller dominated the oil and gas industry, but legal restrictions prohibited his Standard Oil from owning and operating plants outside of Ohio, the state in which it had been incorporated.  These restrictions infringed on Rockefeller and Standard Oil's ability to control the oil market, so Rockefeller developed a scheme to bypass them.

129.    Rockefeller's solution was to begin incorporating Standard Oil companies in each state and running them through the Standard Oil Trust's Board of Trustees that owned and operated each state's Standard Oil.  As part of this dominance, Standard Oil began purchasing controlling shares of smaller entities around the country and bringing them under the Standard Oil Trust's control.  Some of these entities retained their name but became little more than chess pieces in Standard Oil's game of corporate domination.   Standard Oil's scheme would be eventually dismantled by the Supreme Court, but not before it spread to New York.

130.    In the late 1870s, Standard Oil began to focus the scheme on Brooklyn, purchasing stock in several Brooklyn-area gas and oil companies.  In late 1879 Standard Oil, through John D. Rockefeller, entered into an agreement with Charles Pratt and other gas company owners and operators whereby the gas companies would be permitted to use Standard Oil's patented illuminating gas production methods in exchange for the payment of royalties to Standard Oil.  Through this agreement, Standard Oil secured the right to control product prices. Some records indicate that by 1883 Standard Oil owned significant shares of the Williamsburg Gas Light Company.

- 28 -

131.    Also in the late 1800s, Rockefeller controlled a market manipulating stock pool focused on gas companies.  Rockefeller personally owned at least 175 shares of Williamsburg Gas Light Company in 1887.

132.    In 1895 Standard Oil organized the Williamsburg Gas Light Company, The Brooklyn Gas Light Co. Inc., The Nassau Gas Light Co. Inc., Metropolitan Gas Light Co. of Brooklyn, Inc., The People's Gas Light Co. Inc., the Citizens' Gas Co. of Brooklyn, and The Fulton Municipal Gas Co. of Brooklyn to form The Brooklyn Union Gas Company.  Standard Oil maintained control of The Brooklyn Union Gas Company and the Williamsburg MGP for decades following this merger.  In addition, The Brooklyn Union Gas Company, controlled by Standard Oil, purchased the stock of The Newtown Gas Company on November 4, 1895, The Jamaica Gas Light Company on July 30, 1897, The Flatbush Gas Company on May 31, 1897, and Equity Gas Company on May 31, 1897.  Also in 1895, the Brooklyn Union Gas Company was deeded Block 2283, which was later home to the Wythe Avenue Holder Station.  On information and belief, the station operated from 1904 until around 1965.  The station was used to store and distribute Brooklyn Union Gas Company's product.

133.    One of the ways in which Standard Oil used its control of The Brooklyn Union Gas Company (and other entities) was to increase its own sales.  Standard Oil did this by compelling its corporate pawns to purchase Standard Oil products, such as naphtha and gas.  In 1921 alone, The Brooklyn Union Gas Company, compelled by Standard Oil, purchased forty-five million gallons of gasoline from Standard Oil at 12.3 cents per gallon, which was reportedly the highest price ever paid by a local gas company under contract.  This was not an isolated incident: Standard Oil routinely charged its corporate pawns above market rates for the products it sold to them.  These product rates were then used to justify higher gas rates for consumers.

Owning these companies in whole or in part, Standard Oil again benefited from the profit gained by these higher consumer rates. By understating these entities' dividends, Standard Oil was able to pocket additional profits.

134. Fulltime MGP operations at the Williamsburg Works ceased in 1934. The MGP was dismantled prior to 1941, and the Williamsburg MGP site was subdivided and sold to third parties. Neither National Grid nor any of its corporate predecessors or subsidiaries have had control of the site since 1946.

135. As outlined above, hazardous substances would inevitably have been released at the MGP during the period of Standard Oil's control of The Brooklyn Union Gas Company, and thereby the MGP.

Q. Investigatory and Remedial History of the Pratt Works Refinery and Williamsburg MGP Site

136. In 2007, the Williamsburg MGP was listed among other National Grid-associated MGPs in an "Order on Consent and Administrative Settlement" (Index. No. A2-0552-0606, with NYSDEC in February 2007) ("AOC").

137. The AOC directs National Grid, under the supervision of the NYSDEC, to investigate and, if necessary, remediate several MGP sites where coal tar and associated hazardous substances were or may have been disposed at various times in the past.

138. The Williamsburg MGP was not originally subject to the February 2007 AOC, but was added in August 2007. The AOC covered only the small portion of the Bushwick Site on which the MGP was historically located.

139. National Grid worked with NYSDEC to develop an Interim Remedial Measure ("IRM") plan for the Williamsburg MGP site.

140.    On November 7, 2016, prior to NYSDEC's approval of a final Remedial Design/Remedial Action Work Plan, National Grid exercised its right to terminate the Williamsburg MGP from the AOC.  Exhibit G.  Pursuant to AOC Paragraph XIII (A)(1), this termination as effective five days following receipt of written notice, November 14, 2016.

141.    Following withdrawal from the AOC on November 14, 2016, BUG continued to investigate and incur costs at the Bushwick Site.

142.    On November 1, 2017, BUG and NYSDEC entered into a Stipulation and Order of Settlement and Discontinuance in Article 78 proceedings in the Albany County Supreme Court of the State of New York. (ECF No. 116-1.)   By the Stipulation's terms, as of its execution, the AOC would "have no further force or effect with regards to the Williamsburg MGP."  (ECF No. 116-1 at 3.)

143.    Following the Stipulation and Order of Settlement and Discontinuance on November 1, 2017, BUG has continued to investigate and incur costs at the Bushwick Site.

144.    Investigations at the Williamsburg MGP have revealed significant petroleum contamination, which is entrained with various other hazardous materials, including but not limited to, waste oil.

## COUNT I (CERCLA § 107(A)) AGAINST ALL DEFENDANTS

145.    National Grid hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

146.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section:

1.  the owner and operator of a vessel or a facility;

2.  any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of;

3.  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

4.  any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such persons, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for;

    A.  all response costs of removal or remedial action incurred by the United States Government or a state or an Indian tribe not inconsistent with the national contingency plan;

    B.  any other necessary costs of response incurred by any such person consistent with the national contingency plan.

147.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

148.    The Bushwick Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

149.    While under Defendants' ownership, control, and management, their facilities generated "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

150.    These hazardous substances were "released," and/or there remains a threat of release, into the environment within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

151.    When these hazardous substances released, they became entrained with petroleum contaminants present in the environment.

152.    As a result of the releases at and near the Bushwick Site, since November 14, 2016 the Plaintiff has incurred and will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the hazardous substances, and to restore the Bushwick Site.

153.    These costs qualify as costs of response within the meaning of CERCLA and are necessary and consistent with the National Contingency Plan.  42 U.S.C. § 9601(25); 42 U.S.C. § 9605.

154.    Defendants are each liable under Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), as owners and/or operators of the Site.

155.    Defendants are strictly and jointly and severally liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all costs that Plaintiff has incurred and will incur in response to the release or threatened release of hazardous substances from the Site.

<u>**COUNT II (CERCLA § 107(A))**</u>
<u>**AGAINST ALL DEFENDANTS**</u>

156.    National Grid hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

157.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section:

5.  the owner and operator of a vessel or a facility;

6.  any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of;

7.  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

8.  any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such persons, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for;

   A.  all response costs of removal or remedial action incurred by the United States Government or a state or an Indian tribe not inconsistent with the national contingency plan;

   B.  any other necessary costs of response incurred by any such person consistent with the national contingency plan.

158.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

159.    The Bushwick Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

160.    While under Defendants' ownership, control, and management, their facilities generated "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

161.    These hazardous substances were "released," and/or there remains a threat of release, into the environment within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

162.    When these hazardous substances released, they became entrained with petroleum contaminants present in the environment.

163.    As a result of the releases at and near the Bushwick Site, since November 1, 2017 the Plaintiff has incurred and will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the hazardous substances, and to restore the Bushwick Site.

164.    These costs qualify as costs of response within the meaning of CERCLA and are necessary and consistent with the National Contingency Plan.  42 U.S.C. § 9601(25); 42 U.S.C. § 9605.

165.    Defendants are each liable under Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), as owners and/or operators of the Site.

166.    Defendants are strictly and jointly and severally liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all costs that Plaintiff has incurred and will incur in response to the release or threatened release of hazardous substances from the Site.

## COUNT III (CERCLA § 113)[1]
## AGAINST ALL DEFENDANTS

167.    National Grid hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

168.    Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), Plaintiff has a right to contribution for all response costs incurred and to be incurred at the Bushwick site.

169.    Defendants are all responsible for paying an equitable share of costs related to National Grid's work at the Bushwick Site.

---

[1] National Grid acknowledges that its claim under 42 U.S.C. § 9613 is subject to the Court's March 26, 2019 Order on Defendants' Motion to Dismiss.

## COUNT IV (FEDERAL AND CERCLA DECLARATORY JUDGMENT) AGAINST ALL DEFENDANTS

170.    Plaintiff hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

171.    During the period that Defendants owned, managed, directed, and controlled enterprises at or near the Bushwick Site, hazardous substances were released into the environment and/or remain a threat to the environment.

172.    In accordance with applicable federal and state statutes and regulations and the Order on Consent issued by the NYSDEC, Plaintiff has incurred and will continue to incur substantial costs in taking actions to investigate, remediate, and monitor the hazardous substances, and to restore the Bushwick Site.

173.    The determination of the party responsible for these remedial costs represents an actual controversy pursuant to 28 U.S.C. § 2201.

174.    In accordance with the provisions of 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2)(B), Plaintiff seeks a declaration that Defendants are liable to Plaintiff for response costs under 42 U.S.C. § 9607(a).

## COUNT V (THE NEW YORK NAVIGATION LAW) AGAINST ALL DEFENDANTS EXCEPT UNITED STATES

175.    Plaintiff hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

176.    Article 12, Section 181(1) of the New York State Navigation Law ("Navigation Law"), N.Y. Nav. Law §§ 170 – 197, provides that "Any person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained, as defined in this section."

177.    Section 176(8) of the Navigation Law provides that " Notwithstanding any other provision of law to the contrary, including but not limited to section 15-108 of the general obligations law, every person providing cleanup, removal of discharge of petroleum or relocation of persons pursuant to this section shall be entitled to contribution from any other responsible party."

178.    Defendants are "persons" within the meaning of the Navigation Law, N.Y. Nav. Law § 172.

179.    Defendants caused or contributed to the "discharge" of petroleum within the meaning of the Navigation Law, N.Y. Nav. Law § 172.

180.    National Grid has incurred and will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the hazardous substances, and to restore the Bushwick Site.

181.    National Grid is entitled to contributions for remedial expenditures pursuant to the Navigation Law, N.Y. Nav. Law § 176.

**WHEREFORE**, National Grid respectfully requests that this Honorable Court:

A.    Enter judgment for the Plaintiff;

B.    Declare that Defendants are liable for response costs at the Bushwick Site pursuant to the terms of 42 U.S.C. § 9607, 42 U.S.C. § 9613(f)(3), and N.Y. Nav. Law §§ 170 – 197;

C.    Order Defendants to pay the response costs incurred by Plaintiff to date in responding to and remediating the hazardous substance contamination at and around the Bushwick site;

D.      Order Defendants to pay the response costs for all future damages and response costs that Plaintiff may incur in connection with the hazardous substance contamination for which Defendants are liable;

E.      Award Plaintiff damages, as well as response costs;

F.      Award such other relief as this Court deems just.

Respectfully submitted,
National Grid

By its Attorneys,
Dated: May 23, 2019

/s/  J. Michael Showalter
J. Michael Showalter (Bar ID JS2757)
SCHIFF HARDIN LLP
666 Fifth Avenue, Suite 1700
New York, NY 10103
Phone:  312.258.5561
Fax:  312.258.5600
Email:  mshowalter@schiffhardin.com

Russell Selman (*pro hac vice*)
Bradley Rochlen (*pro hac vice*)
Robert Middleton (*pro hac vice*)
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Phone:  312.258.5500
Fax:  312.258.5600
Email:  rselman@schiffhardin.com
Email:  brochlen@schiffhardin.com
Email:  rmiddleton@schiffhardin.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on May 23, 2019, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which constitutes service on all parties of record.

__/s/ J. Michael Showalter_____