IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE BROOKLYN UNION GAS COMPANY,

Plaintiff,

-against-

EXXON MOBIL CORPORATION,

Defendant.

**THIRD AMENDED COMPLAINT**

Civil Action No.: 1:17-cv-00045-MKB-ST

Plaintiff The Brooklyn Union Gas Co. d/b/a National Grid NY ("National Grid"), for its Amended Complaint against Defendant Exxon Mobil Corporation alleges as follows:

## I. INTRODUCTION

1.     This is a civil action for cost recovery arising out of the disposal, release, and/or threatened release of hazardous substances into the environment at current and historical facilities owned and/or operated by Defendant Exxon Mobil Corporation ("ExxonMobil" or "Exxon") adjacent to the Bushwick Inlet and the East River in Brooklyn, New York.

2.     Plaintiff, The Brooklyn Union Gas Company d/b/a National Grid NY, is a New York corporation located at One MetroTech Center, Brooklyn, New York 11201. Plaintiff's historical Williamsburg Works Manufactured Gas Plant ("Williamsburg MGP") was operated and controlled by Defendant ExxonMobil and/or its corporate predecessors and sat on Block 2287 (the "Williamsburg MGP Site") adjacent to the facilities owned and/or operated by Defendant.

3.     Defendant ExxonMobil is a New Jersey corporation with a principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039-2298. Exxon's corporate

predecessors Charles Pratt & Co., Astral Oil Company, and Standard Oil owned, managed, and/or operated the Pratt Works Refinery (the "Refinery"). The Refinery occupied Blocks 2277 and 2294 as well as the pipelines leading into and out of the Refinery (the "Refinery Site") and was owned by ExxonMobil and/or its corporate predecessors. The Refinery manufactured kerosene from coal and/or crude petroleum and produced naphtha and lubricant oils. Constructed in the 1860s, the Refinery utilized numerous gravitational and/or physical or chemical oil/water/solid separation units, such as ditches and other conveyances, sumps, stormwater units, tanks, induced air flotation units, and impoundments. These separation units generated sludges that Exxon discharged and released to the environment. The Refinery operated over forty tanks holding tar, crude oil, and refined materials that generated tank bottoms, which Exxon discharged and released to the environment. In addition, the materials contained within these tanks came into contact with or became entrained with the tank bottoms before Exxon discharged and released them into the environment. Exxon utilized and discharged solvents, acids, and catalysts from the Refinery into the environment.

4.      Many structures contained asbestos, which Exxon also released into the environment. The Refinery was among the world's largest refinery operations through the 1880s. Operations at the Refinery continued through the 1920s. During its decades of operation at the Refinery Site and the Williamsburg MGP Site, ExxonMobil and/or its corporate predecessors caused the disposal and release into the environment of hazardous substances such as sludge generated from separation units, emulsion solids, cleaning sludges, tank bottoms, storage tank sediments, spent catalyst, waste oil, and various materials that came into contact with these hazardous substances or became entrained with these hazardous substances, such as gasoline, and/or petroleum. The constituents from these substances including metals, volatile organic

compounds ("VOCs"), and semi-volatile organic compounds ("SVOCs") also came to be located on and near the Refinery Site and Williamsburg MGP Site. In addition, these hazardous substances came into contact with or became entrained with gasoline and other petroleum products that were released at the Refinery Site and Williamsburg MGP Site.

5.     This action is brought under the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the New York Navigation Law, N.Y. Nav. Law §§ 170 – 197.

6.     National Grid has incurred, and may in the future incur, substantial response costs relating to environmental investigation, remediation, and monitoring of the Williamsburg MGP Site and the Refinery Site. National Grid seeks a judgment against Defendant awarding response costs for Defendant's share of such costs under 42 U.S.C. § 9607(a), 42 U.S.C. § 9613(f)(3), and N.Y. Nav. Law §§ 170 – 197.

## II.  JURISDICTION AND VENUE

7.     This court has jurisdiction over this action's federal claims pursuant to 42 U.S.C. § 9607 and 28 U.S.C. §§ 1331 & 1332. This Court has jurisdiction over related State law claims pursuant to 28 U.S.C. § 1367.

8.     The court has the authority to issue a declaratory judgment concerning the rights and liabilities of the parties pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the historical facilities owned and/or operated by Defendant were located within the district.

### III. BACKGROUND AND ALLEGATIONS

A.    Kerosene Refineries

10.    In the mid-1800s, American energy companies began to construct refineries to extract kerosene from coal and petroleum. Kerosene was extracted from coal by heating it in a vessel known as a retort, which permitted vapor to condense and separate from the coal. Kerosene was extracted from crude petroleum through a complex heating and cooling distillation process.

11.    Less volatile and flammable than gasoline, kerosene was widely used for heating, lighting, and cooking beginning in the nineteenth century. Kerosene is still in use today for cooking, as a lubricant, as an ingredient in pesticides, and as a jet fuel.

12.    Based on information and belief, then non-marketable waste materials, including gasoline, were disposed of in various ways, including dumping onto land or water bodies where such materials became entrained with other hazardous substances.

13.    On information and belief, hazardous substances present at the Williamsburg MGP Site and the Refinery Site are consistent with those associated with kerosene refineries.

B.    Manufactured Gas Plants

14.    Between 1816 and the early 1970s, approximately 1,000 to 1,500 manufactured gas plants ("MGPs") were built and operated in the United States. After approximately 1872, petroleum products were used to produce gas at MGPs. Prior to the development of natural gas transmission systems in the 1940s and 1950s, much of the gas used in the United States for heating, cooking, and lighting was manufactured at MGPs.

15.    Holder stations situated near MGPs acted as gas storage and distribution locations.

16.     MGPs used oil in the production process and produced tars as byproducts of the generation process.  These byproducts typically had a ready market.

17.     The Brooklyn Union Gas Company has begun investigation and characterization activities at the Williamsburg MGP Site focused in part on the former MGP operations.  These activities have developed evidence of significant non-MGP contamination, which is believed to result from Defendant's operations, including its control of The Brooklyn Union Gas Company.

C.     Location

18.     The Williamsburg MGP Site is located in Brooklyn, New York, adjacent to the Bushwick Inlet and the East River.  Exhibit A.

19.     The Williamsburg MGP Site comprises Block 2287 and extending into the surrounding streets (north of N. 11th Street, east of Kent Avenue, south of N. 12th Street, and west of East River).

20.     The Refinery Site comprises Block 2294 (between N. 10th Street and N. 11th Street, west of Kent Avenue and separated from Block 2287 by N. 11th Street), also known as Parcel 5; Block 2277 (north of N. 12th Street, west of Kent Avenue and separated from Block 2287 by N. 12th Street), known as N. 12th Street Refinery or N. 13th Street Plant, and also known as Parcel 6.  Exhibit A.

21.     The Refinery Site bounds the Williamsburg MGP Site on two sides.  The MGP's operations were confined to a sliver of land between multiple Pratt Works parcels to the north and south.  Exhibit A.

22.     Defendant Exxon formerly operated on Blocks 2277 and 2294.  Exhibit A.

D.     ExxonMobil's History of Refinery Operations

23.     Construction of the Pratt Works Refinery began in the 1860s and was complete in 1870 under the name Charles Pratt & Company.  The Refinery was an instant success; both

Charles Pratt and his Astral Oil—the name he gave the kerosene the Refinery produced—found great popularity. Circa 1873, Pratt became a director of Standard Oil Company as his company was brought into Standard Oil. The following year, Pratt's company was reorganized to act as a holding company for Standard Oil Company. In 1892, following years of close corporate ties between the companies, Standard Oil Company purchased the property of Charles Pratt & Company, including the Refinery. On information and belief, by this time, Standard Oil had also acquired Eagle Oil Company, which had established its Eagle Oil Works refinery near to the Pratt Works Refinery by 1868. These acquisitions were part of a much larger Standard Oil program; as noted in the draft Newtown Creek Data Applicability Report, the company would eventually own and operate fifty refineries in the area near Newtown Creek in Brooklyn.

24.     From 1870 through the early 1900s, Pratt Works Refinery primarily manufactured, refined, and exported kerosene for illumination. Crude oil would arrive via ships, railroad, or pipelines. Once the crude oil was onsite, the manufacturing process involved four primary steps: (1) fractional distillation, in which petroleum was transferred into horizontal cylindrical stills and heated to force it to separate into its constituent components which were then run through cool running water and separated into a series of smaller tanks; (2) condensation of the kerosene distillate; (3) agitation of the distillate with acid in order to bleach and deodorize; and (4) agitation with caustic soda or ammonia in order to neutralize any acids remaining in the kerosene.

25.     Pratt's sales grew rapidly, and the Refinery expanded accordingly. The Refinery only began operations around 1870, but by 1872 more than 250,000 families relied on Pratt's Astral Oil for their heating and cooking needs. In 1872, Pratt Works was refining about seven million gallons of crude petroleum a year. By 1876, the Refinery handled nearly forty-three

million gallons of crude petroleum a year.  This translates to over 120,000 gallons of crude oil refined each day at Pratt Works.

26.    At its peak, the operation was one of the largest of its kind in the country, employing over seven hundred individuals and handling more than sixty million gallons per year of kerosene, crude petroleum, refined oils, naphtha, tar, benzene, lubricating oils, gasoline, and turpentine.  Pratt Works had in excess of forty tar and naphtha tanks onsite, numerous oil/water/solid separation units, and asbestos containing material covered numerous pieces of equipment.  The tanks, separation units, and other equipment released materials into the environment at the Site.

27.    As Pratt Works' kerosene production operations grew, the Refinery began a factory for constructing tin cans for use in canning and distributing kerosene.  By the late 1880s, the canning factory grew to occupy two floors of one of the buildings onsite.  The cannery's principal output was five-gallon cans for exporting kerosene.  In addition to the five-gallon cans, the cannery manufactured specialized transport containers, such as ten-gallon galvanized drums.  The cannery's success was such that at some point the cannery may have been the main operation at the Pratt Works as refining operations possibly halted altogether.  The Refinery housed numerous oil storage and filling tanks to manage shipments of kerosene.

28.    Based on information and belief, the canning and shipping operations would result in the release of hazardous substances including metals, VOCs , and SVOCs, all of which remain at or adjacent to the Refinery Site and the Williamsburg MGP Site.

29.    To supply Standard Oil's ever-growing corporate holdings in Brooklyn, a Standard Oil Company pipeline snaked around the borough.  A Standard Oil affiliate built a 6" pipeline to

serve Brooklyn-area refineries in 1879.  The pipeline extended beneath the Hudson River, through modern-day Central Park, and under the East River to Newtown Creek.

30.     In the early 1880s and into the early 1900s, Standard Oil extended the pipeline to the Refinery Site and the Williamsburg MGP Site.  That pipeline crossed Newtown Creek to Sone and Fleming Oil Works.  From there, the pipeline extended down along Meserole Avenue south to Franklin Street near N. 15th Street, south on Franklin Street to N. 14th Street near Block 2282 (Parcel 7), south along Kent Avenue, west through Block 2277 (Parcel 6), south across N. 12th Street through Block 2287 (Parcel 3), south across N. 11th Street to Block 2294 (Parcel 5), north across N. 11th Street through Block 2287 (Parcel 4), and north across N. 12th Street to Block 2277 (Parcel 6).  Exhibit A.  The Standard Oil pipeline ran through the Williamsburg MGP, connecting portions of the Refinery on Block 2277 and Block 2294.  Exhibit A.

31.     In the early 1930s, Standard Oil installed 6" steam piping running across the Williamsburg MGP.  This piping, installed 16-19' above N. 11th Street and N. 12th Street, conveyed steam between Standard Oil's operations at Block 2294 and Block 2277.

32.     On information and belief, another Standard Oil pipeline ran through the East River and into the northwest corner of Brooklyn.  This pipeline ran through the Brooklyn Navy Yard north to the Refinery Site.  Pipelines were the main method of transporting crude oil to the Refinery from the 1880s until approximately 1920, when barges became the primary method of transport.  An asphalt dock on the East River accommodated barges, while an onsite railroad depot was also used to transport crude oil and export kerosene and other products.

33.     The Refinery was plagued with accidents, spills, and leaks.  In many instances, these problems arose before the crude oil even arrived at the Refinery.  Until 1907, the Refinery

regularly combatted fires on the wooden sailing ships that were used to deliver crude oil in wooden barrels.

34.    Multiple fires ravaged the Refinery.  An 1871 fire was contained to a single oil tank, but another fire in the winter of 1873 consumed six stills full of crude oil and poured burning oil along the snow, creating spiral columns of fire which threatened to destroy the Williamsburg MGP.  The 1884 fire burned through eight tanks of crude oil, four tanks of naphtha, and one tank of tar.  That fire extended to the wharf where oil-filled schooners docked.  Boiling oil overflowed from the sinking ships straight into the water, and a floating island of oil, 50-yards in diameter, was only contained by fire-boats.  In 1891 and 1895, explosions rocked the stills and distilling tanks at the Refinery.  In 1909, Bushwick Inlet burned with burning oil after drainage from the Refinery was carried up stream and caught fire when a boat passenger threw a cigar into the water.

35.    The many accidents, spills, leaks, and fires at the Refinery resulted in the discharge and release of multiple contaminants, including kerosene, crude petroleum, refined oils, naphtha, tar, benzene, lubricating oils, turpentine, sludges, tank bottoms and sediments, solvents, acids, catalysts, and asbestos.

36.    The Refinery utilized numerous gravitational and/or physical or chemical oil/water/solid separation units, such as ditches and other conveyances, sumps, stormwater units, tanks, induced air flotation units, and impoundments.  These separation units generated sludges that Exxon discharged and released into the environment.

37.    The Refinery used over forty tanks holding tar, oil, and materials that generated tank bottoms and sediments, which Exxon discharged and released to the environment.  In

addition, the materials contained within these tanks came into contact with or became entrained with the tank bottoms before Exxon discharged and released them into the environment.

38.    Various solvents, acids, and catalysts were used at the Refinery and discharged into the environment.

39.    Many structures at the Refinery contained asbestos, which also was released into the environment.

40.    Upon information and belief, the hazardous substances, including the non-marketable petroleum-based materials, became entrained with other materials at and adjacent to the Refinery Site and have migrated onto or adjacent to the Williamsburg MGP Site.

41.    Upon information and belief, these non-marketable petroleum wastes associated with the Pratt Works Refinery and other hazardous substances including slop oil, separator sludge, and tank bottom residue remain upon, and in the vicinity of, the Refinery Site and have migrated onto or adjacent to the Williamsburg MGP Site.

E.    Standard Oil's Operation and Ownership of the Williamsburg MGP

42.    The Williamsburg MGP was constructed around 1863 by the Williamsburg Gas Light Company.  The Williamsburg MGP was constructed in a six-acre parcel adjacent to and bound by the Refinery on two sides

43.    In the late 1800s, John D. Rockefeller dominated the oil and gas industry, but legal restrictions prohibited his Standard Oil from owning and operating plants outside of Ohio, the state in which it had been incorporated.  These restrictions infringed on Rockefeller and Standard Oil's ability to control the oil market, so Rockefeller developed a scheme to bypass them.

44.    Rockefeller's solution was to begin incorporating Standard Oil companies in each state and running them through the Standard Oil Trust's Board of Trustees that owned and operated each state's Standard Oil.  As part of this dominance, Standard Oil began purchasing

controlling shares of smaller entities around the country and bringing them under the Standard Oil Trust's control. Some of these entities retained their name but became little more than chess pieces in Standard Oil's game of corporate domination. Standard Oil's scheme would be eventually dismantled by the Supreme Court, but not before it spread to New York.

45.     In the late 1870s, Standard Oil began to focus the scheme on Brooklyn, purchasing stock in several Brooklyn-area gas and oil companies. In late 1879, Standard Oil, through John D. Rockefeller, entered into an agreement with Charles Pratt and other gas company owners and operators whereby the gas companies would be permitted to use Standard Oil's patented illuminating gas production methods in exchange for the payment of royalties to Standard Oil. Through this agreement, Standard Oil secured the right to control product prices. Some records indicate that by 1883 Standard Oil owned significant shares of the Williamsburg Gas Light Company.

46.     Also in the late 1800s, Rockefeller controlled a market manipulating stock pool focused on gas companies.

47.     In 1895, Standard Oil representatives formed The Brooklyn Union Gas Company for the purpose of acquiring the Williamsburg Gas Light Company, The Brooklyn Gas Light Co. Inc., The Nassau Gas Light Co. Inc., Metropolitan Gas Light Co. of Brooklyn, Inc., The People's Gas Light Co. Inc., the Citizens' Gas Co. of Brooklyn, and The Fulton Municipal Gas Co. of Brooklyn. Standard Oil maintained control of The Brooklyn Union Gas Company and the Williamsburg MGP for decades following this merger. In addition, The Brooklyn Union Gas Company, controlled by Standard Oil, purchased the stock of The Newtown Gas Company on November 4, 1895, The Jamaica Gas Light Company on July 30, 1897, The Flatbush Gas Company on May 31, 1897, and Equity Gas Company on May 31, 1897. Also in 1895, the

Brooklyn Union Gas Company was deeded Block 2283, which was later home to the Wythe Avenue Holder Station.  On information and belief, the station operated from 1904 until around 1965.  The station was used to store and distribute Brooklyn Union Gas Company's product.

48.     One of the ways in which Standard Oil used its control of The Brooklyn Union Gas Company (and other entities) was to increase its own sales.  Standard Oil did this by compelling The Brooklyn Union Gas Company and other entities to purchase Standard Oil products, such as naphtha and gas.  In 1921 alone, The Brooklyn Union Gas Company, compelled by Standard Oil, purchased forty-five million gallons of gasoline from Standard Oil at 12.3 cents per gallon, which was reportedly the highest price ever paid by a local gas company under contract.  This was not an isolated incident: Standard Oil routinely charged its corporate pawns above market rates for the products it sold to them.  These product rates were then used to justify higher gas rates for consumers.  Owning these companies in whole or in part, Standard Oil again benefited from the profit gained by these higher consumer rates.  By understating these entities' dividends, Standard Oil was able to pocket additional profits.

49.     Fulltime MGP operations at the Williamsburg MGP ceased in 1934.  The Williamsburg MGP was dismantled prior to 1941, and it was subdivided and sold to third parties.  Neither National Grid nor any of its corporate predecessors or subsidiaries have had control of the site since 1946.

50.     As outlined above, Exxon would have inevitably released hazardous substances at the Williamsburg MGP Site during the period of Standard Oil's control of The Brooklyn Union Gas Company.

F.    Investigatory and Remedial History of the Refinery and Williamsburg MGP Site

51.    In 2007, the Williamsburg MGP was listed among other National Grid-associated MGPs in an "Order on Consent and Administrative Settlement" (Index. No. A2-0552-0606) with NYSDEC in February 2007 ("AOC").

52.    The AOC directs National Grid, under the supervision of the NYSDEC, to investigate wastes associated with MGP operations and, if necessary, remediate several MGP sites where coal tar and associated hazardous substances were or may have been released at various times in the past.

53.    The Williamsburg MGP was not originally subject to the February 2007 AOC, but was added in August 2007.  The AOC covered only a portion of the Williamsburg MGP Site on which the MGP was historically located.

54.    National Grid worked with NYSDEC to develop an Interim Remedial Measure ("IRM") plan for MGP wastes at the Williamsburg MGP Site.

55.    On November 7, 2016, prior to NYSDEC's approval of a final Remedial Design/Remedial Action Work Plan, National Grid exercised its right to terminate the Williamsburg MGP from the AOC.  Exhibit B.  Pursuant to AOC Paragraph XIII (A)(1), this termination as effective five days following receipt of written notice, November 14, 2016.

56.    Following withdrawal from the AOC on November 14, 2016, National Grid continued to investigate and incur costs at the Williamsburg MGP Site and the Refinery Site.

57.    On November 1, 2017, National Grid and NYSDEC entered into a Stipulation and Order of Settlement and Discontinuance in Article 78 proceedings in the Albany County Supreme Court of the State of New York. (ECF No. 116-1.)  By the Stipulation's terms, as of its execution, the AOC would "have no further force or effect with regards to the Williamsburg MGP."  (ECF No. 116-1 at 3.)

58.     Following the Stipulation and Order of Settlement and Discontinuance on November 1, 2017, National Grid has continued to investigate and incur costs at the Refinery Site and the Williamsburg MGP Site.

59.     Investigations at the Williamsburg MGP Site have revealed significant petroleum contamination, which is entrained with various other hazardous materials, including, but not limited to, waste oil.

60.     In December 2018, Exxon and the City of New York entered into an Order on Consent under the New York Navigation Law requiring Exxon to investigate portions of Block 2277 of the Refinery Site. (ECF No. 25-1.)

61.     As part of the 2018 Order on Consent, the City of New York approved Exxon's Site Characterization Work Plan for the Former Bayside Fuel Depot on Block 2277 of the Refinery Site.

62.     Exxon's Block 2277 Work Plan is a limited surficial investigation focused on investigating post-Refinery activity on Block 2277. In a June 16, 2020 email, NYSDEC's Law Department Section Chief Benjamin Conlon stated that the Exxon investigation is being done under the "Navigation Law/Petroleum spill" law.  (June 16, 2020 Email from Benjamin Conlon to Francis Murphy, attached herein as Ex. C.) This statement is supported by the Work Plan itself, which states that it was designed using Major Oil Storage Facility ("MOSF") closure requirements – also known as Article 12 of the New York Navigation Law – as well as NYSDEC Division of Environmental Remediation Technical Guidance for Site Investigation and Remediation (DER-10).   MOSF investigations, as their name implies, investigate major oil storage facilities, not oil refineries.  At Block 2277, major oil storage facility operations had no relationship to Exxon's Refinery activities.  Indeed, the major oil storage operations were run by

an unrelated entity and occurred decades after Exxon's Refinery closed.  As such, neither NYSDEC nor Exxon's limited Block 2277 Work Plan state that Exxon has agreed to or initiated any investigation into Exxon's Refinery releases, which likely exist far below the surficial depths of the MOSF facility.

63.     However, Exxon has failed to thoroughly investigate the Refinery Site and has not characterized petroleum and other releases to their full depth per NYSDEC DER-10, the relevant NYSDEC guidance for this investigation.

## COUNT I (CERCLA § 107(A))

64.     National Grid hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

65.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section:

1. the owner and operator of a vessel or a facility;

2. any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of;

3. any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

4. any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such persons, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for;

A. all response costs of removal or remedial action incurred by the United States Government or a state or an Indian tribe not inconsistent with the national contingency plan;

B. any other necessary costs of response incurred by any such person consistent with the national contingency plan.

66.    Defendant Exxon is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

67.    The Williamsburg MGP Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

68.    While under Defendant's ownership, control, and management, its facilities generated "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

69.    These hazardous substances were "released," and/or there remains a threat of release, into the environment within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

70.    When these hazardous substances released, they became entrained with petroleum contaminants present in the environment. On information and belief, hazardous substances from the Refinery Site have been released into the physical boundaries of the Williamsburg MGP Site.

71.    As a result of the releases at and near the Williamsburg MGP Site, since November 14, 2016, the Plaintiff has incurred and will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the hazardous substances, and to restore the Williamsburg MGP Site.

72.    These costs qualify as costs of response within the meaning of CERCLA and are necessary and consistent with the National Contingency Plan.  42 U.S.C. § 9601(25); 42 U.S.C. § 9605.

73.    Defendant is liable under Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), as owners and/or operators of the Williamsburg MGP Site and the Refinery Site.

74.    Defendant is strictly liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all costs that Plaintiff has incurred and will incur in response to the release or threatened release of hazardous substances from the Williamsburg MGP Site and the Refinery Site.

## COUNT II (CERCLA § 107(A))

75.    National Grid hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

76.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section:

1. the owner and operator of a vessel or a facility;

2. any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of;

3. any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

4. any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such persons, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for;

   A. all response costs of removal or remedial action incurred by the United States Government or a state or an Indian tribe not inconsistent with the national contingency plan;

- 17 -

   B. any other necessary costs of response incurred by any such person consistent with the national contingency plan.

77. Defendant Exxon is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

78. The Williamsburg MGP Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

79. While under Defendant's ownership, control, and management, their facilities generated "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

80. These hazardous substances were "released," and/or there remains a threat of release, into the environment within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

81. When these hazardous substances released, they became entrained with petroleum contaminants present in the environment. On information and belief, hazardous substances from the Refinery Site have been released into the physical boundaries of the Williamsburg MGP Site.

82. As a result of the releases at and near the Williamsburg MGP Site, Plaintiff has incurred costs investigating and characterizing petroleum residuals from the Refinery Site that have, on information and belief, been released into the physical boundaries of the Williamsburg MGP Site. Plaintiff will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the hazardous substances at the Williamsburg MGP Site, and to restore the Williamsburg MGP Site.

83. These costs qualify as costs of response within the meaning of CERCLA and are necessary and consistent with the National Contingency Plan. 42 U.S.C. § 9601(25); 42 U.S.C. § 9605.

84.     As a result of the aforementioned releases at and near the Williamsburg MGP Site, Plaintiff has also incurred costs operating and maintaining a pump system necessary because of the petroleum wastes which, on information and belief, have been released into the physical boundaries of the Williamsburg MGP Site.  Plaintiff will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the hazardous substances at the Williamsburg MGP Site, and to restore the Williamsburg MGP Site.

85.     These costs qualify as costs of response within the meaning of CERCLA and are necessary and consistent with the National Contingency Plan.  42 U.S.C. § 9601(25); 42 U.S.C. § 9605.

86.     Defendant Exxon is liable under Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), as owners and/or operators of the Williamsburg MGP Site and the Refinery Site.

87.     Defendant is strictly liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all costs that Plaintiff has incurred and will incur in response to the release or threatened release of hazardous substances from the Williamsburg MGP Site and the Refinery Site.

## COUNT III (CERCLA § 107(A))

88.     National Grid hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

89.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section:

1.  the owner and operator of a vessel or a facility;

2.  any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of;

3.  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

4.  any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such persons, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for;

    A.  all response costs of removal or remedial action incurred by the United States Government or a state or an Indian tribe not inconsistent with the national contingency plan;

    B.  any other necessary costs of response incurred by any such person consistent with the national contingency plan.

90.    Defendant Exxon is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

91.    The Refinery Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

92.    While under Defendant's ownership, control, and management, their facilities generated "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

93.    These hazardous substances were "released," and/or there remains a threat of release, into the environment within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

94.    When these hazardous substances released, they became entrained with petroleum contaminants present in the environment. On information and belief, hazardous substances from the Refinery Site have been released into the physical boundaries of the Williamsburg MGP Site.

95.    As a result of the releases at and near the Refinery Site, prior to November 14, 2016, Plaintiff incurred and will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the hazardous substances at the Refinery Site.

96.    These costs qualify as costs of response within the meaning of CERCLA and are necessary and consistent with the National Contingency Plan.  42 U.S.C. § 9601(25); 42 U.S.C. § 9605.

97.    Defendant is liable under Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), as owner and/or operator of the Williamsburg MGP Site and the Refinery Site.

98.    Defendant is strictly liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all costs that Plaintiff has incurred and will incur in response to the release or threatened release of hazardous substances from the Williamsburg MGP Site and the Refinery Site.

## COUNT IV (CERCLA § 107(A))

99.    National Grid hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

100.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section:

1.    the owner and operator of a vessel or a facility;

2.    any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of;

3.    any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

4.  any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such persons, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for;

   A.  all response costs of removal or remedial action incurred by the United States Government or a state or an Indian tribe not inconsistent with the national contingency plan;

   B.  any other necessary costs of response incurred by any such person consistent with the national contingency plan.

101.   Defendant Exxon is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

102.   The Refinery Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

103.   While under Defendant's ownership, control, and management, their facilities generated "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

104.   These hazardous substances were "released," and/or there remains a threat of release, into the environment within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

105.   When these hazardous substances released, they became entrained with petroleum contaminants present in the environment. On information and belief, hazardous substances from the Refinery Site have been released into the physical boundaries of the Williamsburg MGP Site.

106.   As a result of the releases at and near the Refinery Site, since November 14, 2016, Plaintiff has incurred and will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the hazardous substances at the Refinery Site.

107.    These costs qualify as costs of response within the meaning of CERCLA and are necessary and consistent with the National Contingency Plan.  42 U.S.C. § 9601(25); 42 U.S.C. § 9605.

108.    Defendant is liable under Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), as owners and/or operators of the Williamsburg MGP Site and the Refinery Site.

109.    Defendant is strictly liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all costs that Plaintiff has incurred and will incur in response to the release or threatened release of hazardous substances from the Williamsburg MGP Site and the Refinery Site.

## **COUNT V (CERCLA § 113)**

110.    National Grid hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

111.    Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), Plaintiff has a right to contribution for all response costs incurred and to be incurred at the Refinery Site and the Williamsburg MGP Site.

112.    Defendant is responsible for paying an equitable share of costs related to National Grid's work at the Refinery Site and the Williamsburg MGP Site.

113.    National Grid acknowledges that its claim under 42 U.S.C. § 9613 is subject to the Court's March 26, 2019 Order on Defendant's Motion to Dismiss, but restates this claim here to preserve for appeal.

## **COUNT VI (FEDERAL AND CERCLA DECLARATORY JUDGMENT)**

114.    Plaintiff hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

115. During the period that Defendant owned, managed, directed, and controlled enterprises at or near the Refinery Site and Williamsburg MGP Site, hazardous substances were released into the environment and/or remain a threat to the environment.

116. In accordance with applicable federal and state statutes and regulations and the Order on Consent issued by the NYSDEC, Plaintiff has incurred and will continue to incur substantial costs in taking actions to investigate, remediate, and monitor the hazardous substances, and to restore the Refinery Site and the Williamsburg MGP Site.

117. The determination of the party responsible for these remedial costs represents an actual controversy pursuant to 28 U.S.C. § 2201.

118. In accordance with the provisions of 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2)(B), Plaintiff seeks a declaration that Defendant is liable to Plaintiff for response costs under 42 U.S.C. § 9607(a).

## COUNT VII (THE NEW YORK NAVIGATION LAW)

119. Plaintiff hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

120. Article 12, Section 181(1) of the New York State Navigation Law ("Navigation Law"), N.Y. Nav. Law §§ 170 – 197, provides that "Any person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained, as defined in this section."

121. Section 176(8) of the Navigation Law provides that " Notwithstanding any other provision of law to the contrary, including but not limited to section 15-108 of the general obligations law, every person providing cleanup, removal of discharge of petroleum or relocation

of persons pursuant to this section shall be entitled to contribution from any other responsible party."

122.    Defendant Exxon is a "person" within the meaning of the Navigation Law, N.Y. Nav. Law § 172.

123.    Defendant caused or contributed to the "discharge" of petroleum within the meaning of the Navigation Law, N.Y. Nav. Law § 172.

124.    National Grid has incurred and will continue to incur substantial response costs in taking actions to investigate, remediate, and monitor the petroleum, and to restore the Refinery Site and the Williamsburg MGP Site.

125.    National Grid is entitled to contributions for remedial expenditures pursuant to the Navigation Law, N.Y. Nav. Law § 176.

**WHEREFORE**, National Grid respectfully requests that this Honorable Court:

A.    Enter judgment for the Plaintiff;

B.    Declare that Defendant Exxon is liable for response costs at the Refinery Site and the Williamsburg MGP Site pursuant to the terms of 42 U.S.C. § 9607, 42 U.S.C. § 9613(f)(3), and N.Y. Nav. Law §§ 170 – 197;

C.    Order Defendant Exxon to pay the response costs incurred by Plaintiff to date in responding to and remediating the hazardous substance contamination at and around the Refinery Site and the Williamsburg MGP Site;

D.    Order Defendant Exxon to pay the response costs for all future damages and response costs that Plaintiff may incur in connection with the hazardous substance contamination for which Defendant is liable;

E.    Award Plaintiff damages, as well as response costs;

F.      Award such other relief as this Court deems just.

Respectfully submitted,
National Grid

By its Attorneys,
Dated: September 14, 2020

/s/  J. Michael Showalter
J. Michael Showalter (Bar ID JS2757)
SCHIFF HARDIN LLP
1185 6th Avenue, Suite 3000
New York, NY 10036
Phone:  312.258.5561
Fax:  312.258.5600
Email:  mshowalter@schiffhardin.com

Russell Selman (*pro hac vice*)
Bradley Rochlen (*pro hac vice*)
Robert Middleton (*pro hac vice*)
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Phone:  312.258.5500
Fax:  312.258.5600
Email:  rselman@schiffhardin.com
Email:  brochlen@schiffhardin.com
Email:  rmiddleton@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on September 14, 2020, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which constitutes service on all parties of record.

___/s/ J. Michael Showalter_____